Derek **ANDREWS**, et al.

v.

**GOODYEAR TIRE & RUBBER COMPANY, INC.,** et al.

**No. Civ.A.98–2895 (NHP).**

United States District Court, D. New Jersey.

Feb. 14, 2000.

Glenn A. Bergenfield, Princeton, NJ, for Plaintiffs.

Marilyn Sneirson, Stephanie Wilson, Michelle G. Darvin, Reed, Smith, Shaw & Mc Clay, LLP, Newark, NJ, for Defendant Goodyear Tire & Rubber Company, Inc.

Richard M. Schall, Patricia A. Barasch, Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano, Cherry Hill, NJ, for Amicus Curiae National Employment Lawyers Association/New Jersey.

Thomas F. Campion, Drinker, Biddle & Shanley, LLP, Florham Park, NJ, for Amicus Curiae The New Jersey Corporate Counsel Association.

Zulima V. Farber, David W. Wissert, Lowenstein Sandler, P.C., Roseland, NJ, for Defendants Thomas Martin Joseph Malyska, Jr., William A. Petri Ralph G. Soden and Gerald Myslinski.

## LETTER OPINION ORIGINAL ON FILE WITH CLERK OF THE COURT

POLITAN, District Judge.

This matter comes before the Court on the appeal by plaintiffs from Magistrate Judge Ronald J. Hedges' Letter Order filed February 16, 1999. This Court heard oral argument on April 8, 1999. For the reasons stated more particularly herein, the Order by Magistrate Judge Hedges is **REVERSED.**

### STATEMENT OF FACTS & PROCEDURAL HISTORY

On June 12, 1998, plaintiffs Derek Andrews, Eric Brown, Lanette Brown, Gregory Butler, Carlos Cortijo, Richard Foendoe, Ernestine Foendoe, George Hudson, Tanya Hudson, Joseph J. Lee, Elizabeth Lee, Jonathan Ratliff, Andrea Ratliff, Nolan Reaves, Elaine Mac–Reaves, Cornell Ross, Demaris Ross, David Simmons, and Doris Simmons (hereinafter collectively referred to as "plaintiffs") filed a Complaint against defendants Goodyear Tire & Rubber Co., Inc. (hereinafter "Goodyear"), Thomas Martin, Joseph Malyska, Jr., William A. Petri, Ralph. G. Soden, Gerald Myslinski and John Feastor in the Superior Court of New Jersey, Law Division, in Middlesex County alleging: (1) racial discrimination pursuant to the New Jersey Law Against Discrimination, N.J.S.A. § 10:5–12(a),(e); (2) failure to promote; (3) intentional infliction of emotional distress; and (4) loss of consortium.[1] See Complaint filed June 12, 1998.

---

1. Plaintiffs misspelled the individual defendants' names in the original Complaint. The Answer submitted on behalf of the individual defendants reflects the correct spelling of the names of the individual defendants. See Answer.

On June 19, 1998, Goodyear filed a Notice of Removal in the United States District Court for the District of New Jersey. *See* Notice of Removal filed June 19, 1998. In the Notice of Removal, Goodyear asserted that plaintiffs' case was removable pursuant to the Labor Relations Management Act, 29 U.S.C. § 185, because plaintiffs comprise Goodyear employees[2] who are parties to a collective bargaining agreement. *See id.*

On June 30, 1998, plaintiffs filed an Amended Complaint to include Daryl Butler as a plaintiff to the pending action. *See* Amended Complaint filed June 30, 1998.[3] On July 14, 1998, defendants filed their respective Answers to plaintiffs' Complaint and also asserted various counterclaims therein. *See* Amended Complaint filed June 30, 1998. On July 20, 1998, plaintiffs filed an Answer to the counterclaims asserted by defendants. *See* Answer filed July 20, 1998.

The factual background of this case was relatively uneventful during the nascent stage of the proceedings. The case, however, takes an interesting turn on or about September 16, 1998 as a result of a conversation which took place during a meeting between plaintiffs' counsel, Glenn Bergenfield (hereinafter "Bergenfield"), and counsel for Goodyear, Marilyn Sneirson (hereinafter "Sneirson"). *See* Affidavit of Glenn Bergenfield in Support of Motion Pursuant to Local Rule of Civil Procedure 72.1 for Appeal of the Letter Order of Magistrate Judge Ronald J. Hedges dated February 16, 1999, Exhibit C (hereinafter "Bergenfield Affidavit"). Apparently, during the course of that meeting, the issue of whether Bergenfield had made *ex parte* communications in violation of the New Jersey Rules of Professional Conduct (hereinafter "*RPCs* ") was born.

On September 25, 1998, Sneirson wrote a letter to Bergenfield memorializing part of the conversation which occurred during that

pivotal September 16 meeting. *See id.* The letter provided, in pertinent part:

> At our meeting on September 16, you disclosed that you have contacted two Goodyear management level employees, one of whom is retired and one a current employee ... You have now apparently ignored the Rules of Professional Conduct concerning ex parte communications with management level employees of Goodyear. This is to demand that you immediately cease communications with Goodyear management and to further advise you that we will be making an appropriate application to the Court concerning this issue.

*See id.; see also* Defendant Goodyear Tire and Rubber Co., Inc.'s Appendix in Opposition to Plaintiffs' Appeal to Reverse the Letter Order of Magistrate Judge Ronald J. Hedges dated February 16, 1999, Exhibit F (hereinafter "Goodyear Appendix").

On October 30, 1998, Sneirson once again corresponded with Bergenfield via a letter. This letter informed Bergenfield that Sneirson had requested a telephone conference call with the Magistrate Judge concerning Bergenfield's alleged *ex parte* communications with Goodyear employees, specifically Bergenfield's communications with Lawrence G. Guffey (hereinafter "Guffey"), a Zone Manager at Goodyear. *See* Goodyear Appendix, page 2. As a result of Sneirson's letter to the Court, the Magistrate Judge granted Goodyear's request and, accordingly, arranged a telephone conference call for November 9, 1998 at 2:45 p.m. *See id.*

Subsequent to the conference call on November 9, Bergenfield wrote a letter to the Magistrate Judge indicating that he was "mystified by what Defendants' lawyers were talking about during our conference call on Monday." *See id.,* Exhibit 4. In seeking to clarify what he believed to be a "misunderstanding" by Goodyear, Bergenfield also wrote a letter to Sneirson dated November

---

**2.** Initially, the other plaintiffs in the case were the wives of the Goodyear employees who were not employed by Goodyear and, therefore, were not parties to the collective bargaining agreement. *See* Complaint, ¶¶ 1–11. On December 16, 1998, however, the parties entered into a Consent Order providing that all claims asserted by the wives of the plaintiffs, namely, Lanette Brown, Ernestine Foendoe, Tanya Hudson, Eliz-

abeth Lee, Andrea Ratliff, Elaine Mac–Reaves, Demaris Ross and Doris Simmons are dismissed with prejudice as to all defendants. *See* Consent Order filed December 16, 1998.

**3.** According to the Amended Complaint, John Feastor is no longer a defendant in this action.

11, 1998 wherein he attempted to explain that his conduct in contacting Al Venezia (hereinafter "Venezia"), another Goodyear employee, did not violate the *RPCs. See id.* Bergenfield explained, only with regard to Venezia, that:

I am surmising that Mr. Venezia told you that I called him up and told him that I represented Goodyear. Let me point out what actually happened. I called up and told him that I was the lawyer representing some black workers who were suing Goodyear and that I heard that he might want to speak to me. He said, "you have a tough case." I said to him that I felt we had a good case, that some of the managers had already confirmed much of the racism at the plant. He interrupted me and asked, do you represent Goodyear or the blacks? And I said, again, the black workers. He said that he did not want to talk to me any further. I asked him if he was sure, he said he was and we said goodbye.

*See id.*

Perhaps momentarily accepting Bergenfield's explanation with regard to his contacts with Venezia, Goodyear again began to focus on Bergenfield's contacts with Guffey, as exemplified by the Proposed Discovery Order submitted by Goodyear to the Magistrate Judge. On November 16, 1998, the Judge entered the Order which provided:

1. Plaintiffs shall provide supplemental responses to defendant, Goodyear's Interrogatory No. 8 which seeks information concerning "each individual from whom a statement relating to any allegation asserted by Plaintiffs in their Amended complaint was taken by Plaintiffs, Plaintiffs' counsel or any other agent or representative of Plaintiff[s]" with "statements" being defined in Goodyear's Interrogatories as Federal Rule 804 definition encompassing oral as well as written statements;

2. A [deposition] shall be taken of Goodyear's current management employee, Larry Guffey, on the issue of whether plaintiff[s'] counsel acted in accordance with the Rules of Professional Conduct in engaging in ex [ ] parte communications with Mr. Guffey;

3. Upon the conclusion of the Guffey [ ] deposition counsel may submit to this Court any application concerning ex parte communications; and

4. Plaintiffs' counsel shall review and respond to the deficiency notice provided by counsel for the individual defendants within 7 days and if the parties are unable to resolve the discovery issues counsel will so notify the Court.

*See id.,* Exhibit 6.

Pursuant to said Order, Guffey's deposition was taken on November 17, 1998 solely on the issue of whether Bergenfield acted in accordance with the *RPCs* in engaging in *ex parte* communications with Guffey. *See* Goodyear Appendix, Exhibit 1. The relevant line of questioning by Sneirson (who, for the first time, professed to be Guffey's attorney) on direct examination and the corresponding testimony was as follows:

Q. Okay. And when was the first time that there was a communication between yourself and Mr. Bergenfield?

A. Mr. Bergenfield phoned me at my home on Labor Day evening, September 2, 1998, at about 8:30 p.m.[4]

Q. Did you invite Mr. Bergenfield to telephone you?

A. No.

Q. Was that the first communication you had with Mr. Bergenfield ever?

A. Yes.

Q. What did Mr. Bergenfield say to you, to the best of your recollection?

A. He told me that he represented the plaintiffs in the case at North Brunswick, and asked me if I was aware that the company had filed a countersuit for libel and slander.

Q. At any time during this telephone conversation, did Mr. Bergenfield ask you if you were represented by counsel?

A. No.

---

**4.** It appears from the record that September 7, 1998 was the actual date upon which Bergenfield spoke with Guffey. *See* Goodyear Appendix, Exhibit 1. Therefore, the Court will refer to the relevant date as September 7, 1998.

Q. At any time during this telephone conversation, did Mr. Bergenfield ask you if you were part of a litigation control group?

A. No.

Q. At any time during this conversation, did Mr. Bergenfield ask you whether you were entitled to legal representation by Goodyear or any other attorney?

A. No.

Q. At any time, did Mr. Bergenfield ask you if you had requested legal representation by Goodyear?

A. No.

Q. At any time during this conversation, did Mr. Bergenfield tell you that you had the right to refuse to talk to him during this telephone conversation?

A. No.

*See id.*, pages 6–8.

On cross-examination by Bergenfield, Guffey testified, in pertinent part:

Q. When you and I spoke, did I tell you that I was a lawyer for certain black employees who were suing Goodyear based upon their claims of racial discrimination of certain managers in North Brunswick?

A. When we spoke, as best I recall, you said you were representing a group of black associates who had filed a suit against Goodyear from the North Brunswick facility, yes.

Q. And I think you said earlier in response to one of Ms. Sneirson's questions that I also told you that they had been sued for libel and slander by Goodyear and its employees for some of the things that they had said about the lawsuit and their treatment.

A. That is correct.

Q. So I discussed both with you, is your best recollection?

A. That's correct.

Q. And it may be obvious, but did you understand that I was the lawyer for the black associates who were suing Goodyear, and not the lawyer for Goodyear, when I spoke to you?

A. Yes.

Q. And did you speak to me freely and voluntarily?

A. Yes.

\*    \*    \*    \*    \*    \*

Q. Do you remember my telling you that Goodyear had- or during our phone conversation that Goodyear had for itself lawyers representing its interests in the lawsuit?

A. I don't recall your saying that.

Q. Do you recall how long we spoke that night?

A. Probably 20, 25 minutes.

Q. I take it you don't remember everything I said during that conversation?

A. The ballgame was on. It's a holiday.

Q. So you had one ear listening to me, and you were watching a football game at the same time?

A. That's the scene.

Q. Okay. Did I tell you that there was a lawsuit, in addition to anything against Goodyear itself, against Thomas Martin, Gary Soden, S–O–D–E–N, William Petry, Joseph Myliska, Gerald Myslinski and John Feastor.

A. I don't remember that.

Q. And when you say you don't remember that, do you think that it did happen, or you just generally don't remember?

A. I really don't remember.

Q. Okay. Do you remember me telling you that the lawyers for Goodyear and those four represented them, and not you?

A. I don't recall that.

Q. Do you recollect you discussing whether you needed a lawyer in a subsequent conversation, and if you don't remember, I guess that is what you have to say; but if you do, tell me.

A. I remember a follow-up conversation that wasn't this conversation.

Q. It wasn't the Labor Day conversation?

A. It wasn't the Labor Day conversation.

Q. Right.

A. But the conversation went along the line that if I got in trouble because I was voicing my wife's concern, you said you would seek me help in getting me the best kick-ass lawyer in Ohio.

Q. And that was in response to your wife's concerns and your concerns if you got fired for talking to me?

A. Yes.

 *  *  *  *  *  *

*See id.*, pages 9–38.

On November 23, 1998, Bergenfield drafted a letter to the Magistrate Judge wherein he advised the Court of "profoundly troubling, unethical behavior by Goodyear in the defense of [the pending case]." *See id.*, page 44. In that letter, Bergenfield first summarized plaintiffs' allegations and defendants' denial of the alleged charges of discrimination. *See id.*, pages 44–45. Bergenfield also contended that he had uncovered some disturbing evidence of discrimination toward African American employees of Goodyear during the course of his investigation of the case. *See id.*, page 46. The "evidence" of discrimination to which Bergenfield referred included, but was not limited to, a memo that Guffey had written on Goodyear's letterhead and subsequently forwarded to Bergenfield. The memo included phrases such as: "Tom Martin [one of the individually named defendants] referred to blacks as 'Spoons' and said that none were qualified for promotion" and "[w]hen I asked what 'spoons' were, he said, 'that is what you Southern boys know as niggers.'" *See* Bergenfield Affidavit, Exhibit D. Apparently displeased with what he perceived to be Guffey's less than truthful testimony during the deposition, Bergenfield further explained how he came to talk to Guffey about the working conditions at Goodyear. *See* Goodyear Appendix, page 46. Bergenfield stated that he received Guffey's name from a former plant manager in North Brunswick, Robert Whyler (hereinafter "Whyler"), who, incidentally, also provided him with "evidence" of discrimination which allegedly took place at Goodyear. *See id.*, page 45. Bergenfield explained:

Whyler told me that there were other managers and former managers who knew of the racism at Goodyear's North Brunswick warehouse. He told me that one of those managers, his boss in North Brunswick, Zone Manager Larry Guffey had also read of Adante's [a Goodyear Vice President] comments in *The Beacon Journal*

and wanted to speak to me. Whyler gave me Guffey's phone number, telling me that he wanted me to call him at home. Whyler thought that Guffey might have memos concerning the racism, at Goodyear's North Brunswick warehouse when he was there, since Guffey was a careful notetaker.

*See id.*

Bergenfield also submitted a Certification by Whyler dated January 14, 1999 which corroborates Bergenfield's contention that Guffey was interested in speaking with Bergenfield and that Guffey suggested that Whyler give Bergenfield his home phone number for purposes of discussing the pending case. *See* Bergenfield Affidavit, Exhibit A.

With regard to Bergenfield's conversation with Guffey, Bergenfield maintained that he "followed Ethics Rule 4.3." *See* Goodyear Appendix, page 46. He then continued to describe the information he received from Guffey, including a copy of the memo he had received from Guffey. *See id.* The remaining portion of Bergenfield's letter expresses Bergenfield's overall dissatisfaction with Goodyear's Rule 26 disclosures. *See id.*, pages 47–49.

In response to Bergenfield's letter, Goodyear forwarded a letter dated December 7, 1998 to the Magistrate Judge requesting an opportunity both to respond to Bergenfield's letter and to submit to the Court Goodyear's legal position as to Bergenfield's alleged violation of *RPCs* 4.2 and 4.3. *See id.*, page 50. Goodyear also enclosed a copy of the deposition transcript of Guffey for the Judge's review. *See id.*

On January 4, 1999, the Magistrate Judge issued a Letter Order which contained a preliminary ruling that Bergenfield "may" have violated *RPCs* 4.2 and 4.3. *See id.*, page 51. Specifically, the Judge, upon review of Guffey's deposition transcript, determined that "[n]othing in the deposition transcript indicates that Bergenfield asked whether Guffey was represented by counsel, whether Guffey was part of defendant[s'] control group, or whether Guffey knew that he did not have to speak with Bergenfield."

*See id.*, page 52. Relying significantly upon the case of *Michaels v. Woodland*, 988 F.Supp. 468 (D.N.J.1997), the Judge concluded that, "*Michaels* implies that an attorney has some obligation to determine whether an individual is either represented by counsel or is part of a litigation control group *before* initiating contact with the individual. There is no indication that Bergenfield made such inquiries before his discussion with Guffey on September 2, 1998." *See id.*, page 53 (emphasis in original).

Bergenfield submitted a response to the preliminary ruling on January 15, 1999. *See id.*, page 55. Bergenfield vehemently argued that he violated neither *RPCs* 4.2 nor 4.3. Specifically, Bergenfield asserted that *RPC* 4.2 is simply inapplicable to his case because "Guffey made clear at his deposition that at the time I spoke with him he was not represented by a lawyer nor was he within the 'litigation control group' and, therefore represented by Goodyear's lawyer." *See id.*, page 56. Bergenfield also argued that he did not violate *RPC* 4.3 because: (1) he told Guffey that he represented the plaintiffs; (2) he informed Guffey that lawyers in New Jersey were representing Goodyear and several employees he had worked with while in New Brunswick; and (3) he asked Guffey if he had a lawyer or if he had spoken with the Goodyear lawyers. *See id.*, page 57. He maintained the position that *RPCs* 4.2 and 4.3 do not require "civil Miranda warnings" to be given by attorneys to potential witnesses. *See id.*, page 58. Bergenfield summarized what he believed to be his ethical obligation as follows: "My job was to tell him truthfully who I represented, use reasonable diligence to make certain that he was not represented, actually, or by being in the litigation control group, and I had to tell him that, as far as I knew, he was not being represented by Goodyear's attorney." *See id.*, page 59. Finally, Bergenfield attached a Certification dated January 15, 1999 wherein he swore, for the first time, that:

> I called Guffey at home on Labor Day, September 7th. I had with me a Xerox copy of ethics rule 4.3. I had already researched the issue and had read copies of the cases decided prior to 1996 ... I told Guffey who I represented. He told

me that he was expecting my call and had notes that he wanted to get before we spoke. I told him that he did not have to speak to me and I asked him if he had a lawyer. I also asked him if he'd spoken to the Goodyear lawyers in New Jersey. I told him that one lawyer represented Goodyear and another represented Tom Martin and the supervisors. He told me that he did not have a lawyer and he'd had no contact with Goodyear's lawyers.

*See* Bergenfield Affidavit, Exhibit B, ¶¶ 3,4.

On January 26, 1999, Goodyear responded to Bergenfield's submission in the form of a letter brief. *See* Goodyear Appendix, Exhibit F. Goodyear argued that: (1) Bergenfield should be disqualified from representing plaintiffs in the pending action as a result of serious violations of *RPCs* 4.2 and 4.3 concerning the *ex parte* communications; (2) the Court should preclude the use of any and all information obtained as a result of *ex parte* communications, including Guffey's memo; and (3) the Court should order plaintiffs to comply with the Court's earlier Order to produce any and all statements, information, telephonic recordings or evidence obtained through *ex parte* communications. *See id.*

More specifically, Goodyear first attacked the credibility of Bergenfield's Certification arguing that, based upon Guffey's deposition and despite Bergenfield's evidential proffer, Bergenfield never asked Guffey if he was a member of Goodyear's litigation control group, if he was represented by Goodyear's counsel, if he was represented by any counsel, that Guffey could refuse to answer his questions or that he had a right to counsel. *See id.* Essentially, Goodyear argued that Bergenfield's Certification was "a transparent and desperate attempt to rewrite history ..." *See id.*, page 149. Goodyear emphasized that at no time prior to the submission of Bergenfield's Certification did Bergenfield state that he had complied with the *RPCs*. *See id.*, page 150.

Goodyear also argued that Bergenfield should be disqualified from the case because he "neither sought prior guidance from this Court nor alerted Defendant of his intent to conduct *ex parte* interviews of its current and

former management employees." *Id.*, page 151–52. Goodyear emphasized that the *Michaels* case stands for the proposition that an attorney has an obligation to determine whether an individual is represented by counsel or is part of the litigation control group *before* initiating contact with the individual. *See id.*, page 154. Goodyear argued that because Bergenfield does not claim that he did "anything" *before* contacting Guffey other than "check the pleadings," he must be disqualified and the ill-gotten gains suppressed. *See id.*

Upon receipt and review of the submissions from the parties, the Magistrate Judge, on February 17, 1999, issued a Letter Order addressing whether: (1) Bergenfield violated *RPCs* 4.2 and 4.3; (2) if Bergenfield is found to have violated *RPCs* 4.2 and/or 4.3, he should be disqualified from the case; and (3) if Bergenfield is deemed to have violated *RPCs* 4.2 and/or 4.3, any information secured in violation of *RPCs* 4.2 and/or 4.3 should be precluded from use in the pending case. *See id.*

The Judge concluded that Bergenfield violated *RPCs* 4.2 and 4.3. Although the Magistrate Judge reiterated Bergenfield's argument that *RPC* 4.2 is inapplicable because *RPC* 4.2 only applies to those persons actually represented by counsel or those in the litigation group, he found this argument to be without merit. The Magistrate Judge supported his conclusion by stating that *RPC* 4.2 applies to this case because "[w]hat Bergenfield overlooks is that it must be determined whether an individual is represented by counsel *before* contacting that individual." *See id.* (emphasis in original). Since the Judge found that Bergenfield did not "seek the necessary information *before* contacting Guffey," he concluded that Bergenfield was not in compliance with *RPC* 4.2. *See id.* (emphasis in original).

The Magistrate Judge also concluded that Bergenfield violated *RPC* 4.3. He remarked that "[n]othing in the transcript of Guffey's deposition indicates that Bergenfield asked whether Guffey was represented by counsel, whether Guffey was part of Goodyear's control group, or whether Guffey knew that he did not have to speak with Bergenfield." *See*

Letter Order filed February 17, 1999. Although the Judge acknowledged Bergenfield's response to the preliminary ruling (which included Bergenfield's Certification wherein he asserted that he did use reasonable diligence), he opined that "[t]here is no indication that Bergenfield sought this information or that he used 'reasonable diligence' to secure the information *before* contacting Guffey." *See id.* (emphasis in original).

Based upon the fact that the Judge found that Bergenfield violated *RPCs* 4.2 and 4.3, the Judge then addressed the "disqualification" issue. The Judge stated that "[e]ven if use of information from Guffey were to be precluded, Bergenfield would still retain knowledge of that information, which was obtained through violation of RPC 4.2 and RPC 4.3." Reasoning that the disqualification of Bergenfield would not cause plaintiffs any prejudice since the case was in its early stages, the Judge concluded that Goodyear met its burden of demonstrating that continued representation by Bergenfield would violate the *RPCs*. *See id.*

Finally, the Magistrate Judge determined that because Bergenfield's discussion with Guffey violated *RPCs* 4.2 and 4.3 and was "related to the essence of the action," the Judge ruled that "any information secured in violation of RPC 4.2 and 4.3 [is] . . . precluded from use." *See id.*

On February 26, 1999, plaintiffs appealed the Magistrate Judge's February 17, 1999 Letter Order to this Court. *See* Notice of Appeal filed February 26, 1999. Goodyear and the individual defendants timely filed opposition memoranda.

On March 8, 1999, the National Employment Lawyers' Association/New Jersey filed a Notice of Motion for Leave to Appear as *Amicus Curiae* in Support of Plaintiffs' Motion Pursuant to Local Civil Rule 72.1 for Appeal from Magistrate Judge Ronald J. Hedges' Letter Order filed February 17, 1999. *See* Notice of Motion filed March 8, 1999.

On March 17, 1999, Goodyear filed a Notice of Motion to Find Bergenfield in Contempt of Judge Hedges' February 17, 1999 Order, for Sanctions and for a Protective

Order Concerning Any Information Relating to Guffey's Memorandum. *See* Notice of Motion filed March 17, 1999.

On April 8, 1999, the New Jersey Corporate Counsel Association filed a Notice of Motion for Leave to Appear as *Amicus Curiae* in Opposition to Plaintiffs' Motion Pursuant to Local Civil Rule 72.1 for Appeal from Magistrate Judge Ronald J. Hedges' Letter Order filed February 17, 1999. *See* Notice of Motion filed April 8, 1999.

This Court heard oral argument in connection with plaintiffs' appeal on April 8, 1999. At that time, the Court requested supplemental briefing from the parties and the *amici* regarding the following issues: (1) whether it is necessary for this Court to conduct a plenary hearing to determine whether a violation of *RPCs* 4.2 or 4.3 has occurred; (2) whether, if a violation of *RPC* 4.2 and/or 4.3 is found, Guffey's statement should be suppressed; and (3) assuming that this Court upheld the Magistrate Judge's Order, thereby disqualifying Bergenfield, can the new attorney representing plaintiffs be precluded from using Guffey's memorandum in the litigation and trial of this case.

On April 9, 1999, this Court granted both motions by the National Employment Lawyers Association/New Jersey and the New Jersey Corporate Counsel Association for Leave to Appear as *Amici Curiae.* The Court also ordered that Goodyear's motion was stayed pending this Court's decision in connection with plaintiffs' appeal which was taken under advisement on April 8, 1999.

In response to the Court's request, both the parties and the *amici* filed supplemental memoranda between May 3 and May 11, 1999.

The following issues before this Court are: (1) whether, pursuant to *RPCs* 4.2 and 4.3,

Bergenfield was obligated to determine if Guffey was in the litigation control group or otherwise represented by counsel "before making contact" with Guffey; (2) whether, upon review of the substantive conversation which took place between Bergenfield and Guffey, Bergenfield violated *RPCs* 4.2 and/or 4.3; (3) whether, if this Court determines that Bergenfield violated *RPCs* 4.2 and/or 4.3, he should be disqualified from this case; and (4) whether, if this Court determines that Bergenfield violated *RPCs* 4.2 and/or 4.3, any information secured in violation of those Rules should be precluded from use in the pending case.

## DISCUSSION

This matter involves a determination by the Magistrate Judge that plaintiffs' attorney, Bergenfield, violated *RPCs* 4.2 and 4.3. Based on that conclusion, the Judge issued a Letter Order disqualifying Bergenfield and precluding from use any information obtained by Bergenfield in violation of *RPCs* 4.2 and 4.3.

## I. STANDARD OF REVIEW

The legal standard of review applicable to a determination made by a magistrate judge depends upon whether the issue to be addressed is dispositive or non-dispositive of the case. Pursuant to the Federal Magistrate Act of 1979, a United States Magistrate Judge may "hear and determine any [non-dispositive] pretrial matter pending before the court." 28 U.S.C. § 636(b)(1)(A) (West 1999).[5] If a magistrate judge directly rules on a non-dispositive pretrial matter and issues an order, a United States District Court Judge may reconsider the order only where it has been shown that the magistrate judge's order is "clearly erroneous or contrary to law." *See id.*[6]

**5.** The Federal Magistrate Act was enacted in 1968 and was referred to simply as the "Federal Magistrates Act." Since 1968, the Act has been amended several times "to expand the scope of the duties of magistrate judges in order to alleviate the increased burdens on district courts." *Cooper Hospital/University Medical Center v. Sullivan, et al.,* 183 F.R.D. 119, 126 (D.N.J.1998) (referencing H.R. Rep. No. 94–1609 (1976), reprinted in 1976 U.S.C.C.A.N. 6162). In 1979, Congress amended the Act and provided that the

short title to the Act be referred to as the "Federal Magistrate Act of 1979."

**6.** The standard of review governing non-dispositive pretrial matters provided in § 636(B)(1)(A) is mirrored in the Federal Rules of Civil Procedure: "The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). The "clearly

By way of comparison, a magistrate judge may also "conduct hearings, including evidentiary hearings," into dispositive matters. *See* 28 U.S.C. § 636(b)(1)(B) (West 1999). However, since a magistrate judge cannot directly rule on a dispositive issue, he must submit to a district judge "proposed findings of fact and recommendations" for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). If, within ten days after being served with a copy of the magistrate judge's proposed findings of fact and recommendations, a party files written objections, a district court judge must make a *de novo* determination of those portions of the report and recommendation to which objection is made. *See id.*

Matters concerning the disqualification of counsel and pretrial discovery matters are invariably treated as non-dispositive pretrial motions by courts in this jurisdiction and elsewhere. *See, e.g., Essex Chemical Corporation v. Hartford Accident and Indemnity Co. et al.*, 993 F.Supp. 241, 245–46 (D.N.J. 1998); *Cardona v. General Motors Corporation*, 942 F.Supp. 968, 971–73 (D.N.J.1996), *motion to certify appeal denied*, 939 F.Supp. 351 (D.N.J.1996); *Williams v. American Cyanamid*, 164 F.R.D. 615, 617 (D.N.J.1996); *Sherwood Group v. W. Riterreiser*, No. 90–2414, 1991 WL 87578, at *1 (D.N.J. May 20, 1991). *See also Hutchinson v. Pfeil*, 105 F.3d 562, 565 (10th Cir.1997), *cert. denied*, 522 U.S. 914, 118 S.Ct. 298, 139 L.Ed.2d 230 (1997); *Gray v. Rhode Island Department of Children, Youth and Families, et al.*, 937 F.Supp. 153, 156 (D.R.I.1996); *Doe v. Marsh, et al.*, 899 F.Supp. 933, 934 (N.D.N.Y.1995); *United States v. Premises Known as 281 Syosset Woodbury Road*, 862 F.Supp. 847, 851 (E.D.N.Y.1994), *aff'd*, 71 F.3d 1067 (2d Cir.1995); *Schwartz v. Marketing Publishing Company*, 153 F.R.D. 16, 22 (D.Conn.1994). Accordingly, this Court may only set aside the Magistrate Judge's Order if it is found to be clearly erroneous or contrary to law.

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). *See also United States v. W.R. Grace & Co.-Conn.*, 185 F.R.D. 184, 188 (D.N.J.1999); *Cardona v. General Motors Corporation, et al.*, 942 F.Supp. 968, 971 (D.N.J.1996), *motion to certify appeal denied*, 939 F.Supp. 351 (D.N.J.1996); *South Seas Catamaran, Inc. v. Motor Vessel "Leeway"*, 120 F.R.D. 17, 21 (D.N.J.1988), *aff'd*, 993 F.2d 878 (3d Cir.1993). A district judge's simple disagreement with the magistrate judge's findings is insufficient to meet the clearly erroneous standard of review. *See Toth v. Alice Pearl, Inc., et al.*, 158 F.R.D. 47, 50 (D.N.J.1994) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (opining that, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (citations omitted)).

Recognizing that the Magistrate Judge's determination is entitled to great deference, this Court must be satisfied that the Order is clearly erroneous or contrary to law. *See Cooper Hospital/University Medical Center v. Sullivan, et al.*, 183 F.R.D. 119, 127 (D.N.J.1998); *Kresefky v. Panasonic Communications and Systems Co., et al.*, 169 F.R.D. 54, 64 (D.N.J.1996); *Exxon Corporation v. Halcon Shipping Co., Ltd., et al.*, 156 F.R.D. 589, 591 (D.N.J.1994); *Harter v. GAF Corporation*, 150 F.R.D. 502, 508 (D.N.J. 1993); *Miller v. Beneficial Management Corporation*, 844 F.Supp. 990, 997 (D.N.J. 1993).

## II. GENERAL HISTORICAL BACKGROUND OF THE NEW JERSEY RULES OF PROFESSIONAL CONDUCT

Prior to the New Jersey Supreme Court's adoption of the *RPCs*, the conduct of attorneys practicing in the State of New Jersey was governed by the Disciplinary Rules of the American Bar Association's Code of Professional Responsibility, as adopted and

erroneous or contrary to law" standard governing non-dispositive matters also has been adopted in this jurisdiction and is provided in Local Civil Rule 72.1(c)(1)(A): "A Judge shall consider the appeal ... and set aside any portion of the Magistrate Judge's order found to be clearly erroneous or contrary to law."

amended by the New Jersey Supreme Court. *See* Report of the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, 112 N.J.L.J., July 28, 1983, supp. at 1.

In July 1982, the New Jersey Supreme Court appointed a special committee "for the purpose of reviewing the American Bar Association's proposed Model Rules of Professional Conduct and recommending to the Court whether those Rules should be adopted in whole or in part in New Jersey." *Id.* The special Committee officially was known as "the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct" and was commonly referred to as "the Debevoise Committee" after the esteemed Chair of the Committee, the Honorable Dickinson R. Debevoise, U.S.D.J. *See* KEVIN H. MICHELS, NEW JERSEY ATTORNEY ETHICS 3 (GANN 1998).

In its report dated June 24, 1983, the Debevoise Committee recommended that the New Jersey Supreme Court adopt the Model Rules [7] along with the modifications suggested by the Committee in its report. *See* Report of the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, 112 N.J.L.J., July 28, 1983, supp. at 2.

On July 12, 1984, the New Jersey Supreme Court adopted the Model Rules, including many of the modifications suggested by the Committee. *See* Rules of Professional Conduct, 114 N.J.L.J., July 19, 1984, supp. at 1. The Court also added some of its own changes to the Model Rules. *See* KEVIN H. MICHELS, NEW JERSEY ATTORNEY ETHICS 3

(GANN 1998). The Rules of Professional Conduct were published in the *New Jersey Law Journal* on July 19, 1984 wherein it was noted that the Rules of Professional Conduct would become effective on September 10, 1984. *See* Rules of Professional Conduct, 114 N.J.L.J., July 19, 1984, supp. at 1–16. At that time, Rule 1:14, as set forth in the Rules of General Application section of the New Jersey Court Rules, was amended to provide that the *RPCs* "shall govern the conduct of the members of the bar." *Id.* at 1.[8] The New Jersey Supreme Court adopted neither the explanatory comments that followed the Rules nor the A.B.A. Comments.[9] *See id.; see also* KEVIN H. MICHELS, NEW JERSEY ATTORNEY ETHICS 3 (GANN 1998).

## III. HISTORICAL BACKGROUND OF THE SUBJECT RULES: 4.2, 4.3, 1.13

### A. *RPC* 4.2

As aforementioned, in June 1983, the Debevoise Committee advised the New Jersey Supreme Court to adopt the Model Rules, including the 1982 Model Rules version of Rule 4.2. *See* Report of the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, 112 N.J.L.J., July 28, 1983, supp. at 1, 23. The Debevoise Committee reviewed Model Rule 4.2 which, at that time, provided:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent

---

7. The American Bar Association's Model Rules of Professional Conduct are referred to as the "Model Rules" or the "A.B.A. Model Rules." *See* KEVIN H. MICHELS, NEW JERSEY ATTORNEY ETHICS 4 (GANN 1998). Hereinafter, this Court will refer to these rules as the "Model Rules."

8. Likewise, Local Civil Rule 103.1(a) of the Local Civil Rules governing the practice of law in the United States District Court for the District of New Jersey provides:

> (a) The Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by

Federal statute, regulation, court rule or decision of law.

Local Civil Rule 103.1(a) (Gann 1999).

9. The New Jersey Supreme Court stated:

> The explanatory comments that follow each rule have not been adopted by the Court nor should they be considered as a formal part of the rules. For assistance in interpreting these rules, reference should be made to the official ABA Comments and the commentary by the Debevoise Committee in its June 24, 1983 report, which appeared as a supplement to the July 28, 1983 issue of the *New Jersey Law Journal.*

*Id.; see also* KEVIN H. MICHELS, NEW JERSEY ATTORNEY ETHICS 3 (GANN 1998).

of the other lawyer or is authorized by law to do so.

Rules of Professional Conduct, 114 N.J.L.J., July 19, 1984, supp. at 11.

Recognizing that Rule 4.2 of the Model Rules was "substantially identical" to DR 7–104(A)(1) [10] of the Disciplinary Rules of the American Bar Association's Code of Professional Responsibility (which previously governed the conduct of New Jersey attorneys), the Debevoise Committee recommended neither expansion nor modification of the terms of Model Rule 4.2. *See* Report of the New. Jersey Supreme Court Committee on the Model Rules of Professional Conduct, 112 N.J.L.J., July 28, 1983, supp. at 23. The Debevoise Committee simply noted in its commentary that Model Rule 4.2 "prohibits an attorney from communicating about the subject of a representation with a party whom the attorney knows to be represented by another lawyer in the matter absent either consent of that lawyer or authorization by law." *Id.* As aforementioned, the New Jersey Supreme Court adopted the recommendation of the Debevoise Committee on July 12, 1984. *See* Rules of Professional Conduct, 114 N.J.L.J., July 19, 1984, supp. at 11.

Because the New Jersey Supreme Court adopted neither the explanatory comments nor the A.B.A. commentary to the Model Rules when it adopted the Model Rules, attorneys practicing law in the State of New Jersey between July 12, 1984 and December 14, 1993 [11] were operating under the amorphous auspices of *RPC* 4.2 with little guidance from the specific terms of the Rule. This situation naturally posed some difficulty to the members of the Bar. For example, the

Rule became unworkable when the litigants involved were not individual persons but, instead, were corporations or organizations. This is because Model Rule 4.2/*RPC* 4.2 prohibited an attorney's *ex parte* communications with a represented "party." Accordingly, the interpretation given to the definition of "party" was the key to the scope of the prohibition. Thus, if the litigants were individual persons, it was easy to ascertain who was a "represented party" and, therefore, who was off-limits. If, however, one of the litigants in a case was an organization or corporation, the attempt to define the scope of the protected class (*i.e.*, current and/or former employees, management or low-level employees) became more challenging. Since a corporation or organization is only capable of acting through natural persons and because the Rule did not define which natural persons within the organization/corporation should be considered "represented parties," this aspect of the Rule was left to the interpretation of attorneys and the courts. *See Public Service Electric and Gas Company v. Associated Electric & Gas Insurance Services, Ltd., et al.*, 745 F.Supp. 1037, 1039 (D.N.J.1990) (hereinafter "*PSE & G* ").

Nevertheless, it is understood by this Court that the explanatory comments, the A.B.A. Comments and the comments made by the Debevoise Committee did operate as sources of edification for attorneys during that period of time. *See State v. CIBA–GEIGY, Corp.*, 247 N.J.Super. 314, 319 n. 4, 589 A.2d 180 (N.J.Super.Ct.App.Div.1991), *leave to appeal granted*, 126 N.J. 338, 598 A.2d 895 (1991), *appeal dismissed as moot*, 130 N.J. 585, 617 A.2d 1213 (1992).[12] At that time, the A.B.A. Comment provided:

**10.** DR 7–104(A)(1) provided:

**Communicating with One of Adverse Interest**
 (A) During the course of his representation of a client a lawyer shall not:
  (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to [b]e represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.
  (2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such per-

son are or have a reasonable possibility of being in conflict with the interests of his client.
 KEVIN H. MICHELS, NEW JERSEY ATTORNEY ETHICS 1012 (APPENDIX B) (GANN 1998).

**11.** December 14, 1993 was the date *Opinion 668*, which established interim guidelines for members of the Bar, was decided by the New Jersey Supreme Court. *See infra.*

**12.** In 1991, the *CIBA–GEIGY* Court explained:

 In adopting the New Jersey Rules of Professional Conduct, our Supreme Court did not

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statements may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule ... This rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question. *Hanntz v. Shiley, Inc. A Division of Pfizer, Inc.,* 766 F.Supp. 258, 266 (D.N.J.1991), (citing Comment to Rule 4.2), *abrogation recognized, In re The Prudential Insurance Company of America Sales Practices Litigation,* 911 F.Supp. 148, 151 n. 2 (D.N.J.1995).

Other sources of guidance, of course, came directly from both the state and federal courts of New Jersey which attempted to clarify the nondescript terms of the Rule. For example, in *PSE & G,* this Judge, based upon the language and history of the Rule at that time, was one of the first to undertake the task of creating a bright-line test for attorneys practicing under the auspices of *RPC* 4.2, which at that time mirrored Model Rule 4.2. *See Public Service Electric and Gas Company v. Associated Electric & Gas Insurance Services, Ltd., et al.,* 745 F.Supp. 1037, 1039 (D.N.J.1990). The issue before this Court was to what extent did *RPC* 4.2 regulate a defendant's *ex parte* contacts with "former" employees of a plaintiff corporation. *See id.* at 1037. In *PSE & G,* this Judge

held that both current and former employees of an organization could not, according to the terms of the Rule at that time, be the subject of informal *ex parte* investigative findings. *See id.* at 1042.

Although some commentators praised the decision [13] and even deemed it a "sensible approach to Model Rule 4.2," [14] the decision sparked much controversy and was widely criticized for creating such a bright-line rule. The decision also created a jurisprudential split in this district, and others, as well as, at the State level regarding whether the Rule applied to *ex parte* communications with "former" employees of an organization. *See Action Air Freight, Inc. v. Pilot Air Freight Corp.,* 769 F.Supp. 899, 903 (E.D.Pa.1991), *appeal dismissed,* 961 F.2d 207 (3d Cir. 1992). *See also Goff v. Wheaton Industries,* 145 F.R.D. 351, 354 (D.N.J.1992) (holding that *RPC* 4.2 does not apply to a corporation's former employees); *Curley v. Cumberland Farms, Inc., et al.,* 134 F.R.D. 77, 80 (D.N.J.1991) (opining that "[t]his Court agrees with Magistrate Simandle that RPC 4.2 does not create a bright-line test prohibiting all ex parte contacts with former employees of a corporate party...."); *Hanntz v. Shiley, Inc. A Division of Pfizer, Inc.,* 766 F.Supp. 258, 263 (D.N.J.1991) (holding that the *RPC* 4.2 permits attorneys to communicate with and interview former employees of a corporate litigant, except to the extent that attorney-client privilege would be invoked), *abrogation recognized, In re The Prudential Insurance Company of America Sales Practices Litigation,* 911 F.Supp. 148, 151 n. 2 (D.N.J.1995); *Neil S. Sullivan Associates, Ltd. v. Medco Containment Services, Inc.,* 257 N.J.Super. 155, 162, 607 A.2d 1386 (1992) (relying upon the "explicit" language of *RPC* 4.2, court permitted the attorney for the plaintiff to conduct an *ex parte* interview

---

adopt the A.B.A. commentary and, therefore, it should not be "considered as a formal part of the rules." The "introduction" to our Rules notes, however, that "reference should be made to the official ABA Comments" "[f]or assistance in interpreting these rules." *See id.* (citations omitted); *see also* KEVIN H. MICHELS, NEW JERSEY ATTORNEY ETHICS 3 (GANN 1998).

**13.** *See generally* Joseph Christian Sekula & Dennis Sean Heffernan, *Ex Parte Communications With Employees of a Business Enterprise: The Need for a Bright Line Test,* 6 ST. JOHN'S LEGAL COMMENT 399, 413 (1991).

**14.** *See* S. Blake Parrish, Jr., *Public Service Electric & Gas Co. v. Associated Electric & Gas Insurance Services, Ltd.: An Expansive View of Rule 4.2 and Ex Parte Contacts with Former Employees,* 1991 UTAH L. REV. 647, 656.

with a former employee of a corporate defendant); *Erickson v. Winthrop Laboratories,* 249 N.J.Super. 137, 142, 592 A.2d 33 (1991) (adopting the *Curley* test and, therefore, rejecting the bright-line test). It is clear that *PSE & G* and the case law that followed the decision served as the catalysts for extensive commentary both by the Bar and the public which ultimately led the New Jersey Supreme Court to reexamine the Rule.[15]

Amidst the controversy surrounding *ex parte* communications with former employees of a corporation, this State's Appellate Division focused on the scope of *RPC* 4.2 with respect to *ex parte* communications with "current" employees of a corporation in *State v. CIBA–GEIGY Corp.,* 247 N.J.Super. 314, 589 A.2d 180 (N.J.Super.Ct.App.Div.1991) (hereinafter *"CIBA–GEIGY"*). In *CIBA–GEIGY,* the Appellate Division relied upon the reasoning set forth in the New York Court of Appeals case of *Niesig v. Team I, et al.,* 76 N.Y.2d 363, 558 N.E.2d 1030, 559 N.Y.S.2d 493 (1990) and held that an attorney could not engage in *ex parte* communications with a current employee of a corporation if that employee's communications could be "imputed to the corporation for purposes of liability ... All other employees may be interviewed informally." *State v. CIBA–GEIGY Corporation,* 247 N.J.Super. 314, 325, 589 A.2d 180 (N.J.Super.Ct.App.Div.1991).

On June 27, 1991, the New Jersey Supreme Court granted leave to appeal the Appellate Division's decision in *CIBA–GEIGY.* *State v. Ciba–Geigy Corp.,* 126 N.J. 338, 598 A.2d 895 (1991). Seeing this overture as the first step by the New Jersey Supreme Court toward clarifying the Rule, members of the Bar, professors, and the media eagerly anticipated the New Jersey Supreme Court's decision. Regardless, the appeal was dismissed as moot on April 28, 1992. *State v. Ciba–Geigy Corp.,* 130 N.J. 585, 617 A.2d 1213 (1992).

As a result of an advisory committee opinion issued in 1992 which extended the *CIBA–GEIGY* reasoning to *ex parte* interviews with former employees of a corporate litigant, the New Jersey Supreme Court began taking a more proactive role in attempting to define *RPC* 4.2, beginning with the Court's opinion in, *In the Matter of Opinion 668 of the Advisory Committee on Professional Ethics,* 134 N.J. 294, 633 A.2d 959 (1993) (hereinafter *"Opinion 668"*).

In *Opinion 668,* the New Jersey Supreme Court articulated at the outset that it merely was establishing interim rules dealing with the ethical restraints on attorneys conducting *ex parte* interviews of current and former employees until such time as a special advisory committee could research the issue and render an advisory opinion. *See Opinion 668,* 134 N.J. at 297, 633 A.2d 959. Notwithstanding the difficulty in balancing the competing interests, the Court stated that *RPC* 4.2 shall be limited in the organizational context to: "(a) the control group, which, for now, we interpret to mean those employees of the organization trusted with the management of the case or matter in question, and (b) the employee or employees whose conduct, in and of itself, establishes the organization's liability." *Id.* at 303, 633 A.2d 959. Regarding the latter group, the Court interpreted *RPC* 4.2 to "require notice to, rather than consent from, the organization's attorney...." *Id.* The Court supported its conclusion by stating:

> Were we to adopt a blanket rule prohibiting interviews with all employees whose statements might be admissible against a corporation, virtually no pre-filing investigations of claims against corporations could be conducted without the consent of corporate counsel. Real problems have been posed concerning how an attorney preparing, for example, an employment discrimination case would be able to satisfy himself or herself that the complaint was well-founded in fact and was not frivolous.

---

**15.** Following the *PSE & G* opinion, the A.B.A.' Standing Committee on Ethics and Professional Responsibility also endeavored to address the issue of the applicability of Model Rule 4.2 to "former employees." Yet, most commentators found that the Opinion failed to provide new insight. *See, e.g.,* Susan J. Becker, *Conducting Informal Discovery of a Party's Former Employees: Legal and Ethical Concerns and Constraints,* 51 Md. L. Rev. 239, 285 (1992) (citing A.B.A. Comm. on Ethics and Professional Responsibility, Formal Op. 359 (1991)).

On the other hand, we agree that a corporation should not be at a trial disadvantage by virtue of its corporate status. Hence, those employees trusted with conducting a suit or claim on behalf of a corporation should receive the same ethical respect from adversary counsel under RPC 4.2 as an individual would in managing his or her own claim. We also believe, although we are not yet certain of this point, that a category of employees may exist whose conduct is so directly linked to the corporation that adversary counsel should not have unrestricted ex parte access to such individuals.

*Id.* at 300–01, 633 A.2d 959.

Despite the Justices' efforts, the legal community criticized *Opinion 668* for its vagueness. *See* 132 N.J.L.J. 614 (Nov. 9, 1992), *Ex Parte Contacts O.k., But Still an Ethics Risk* by Richard Pliskin. In fact, the Opinion appeared to do nothing to quell the debate which continued to rage between plaintiffs' attorneys and corporate defense attorneys seeking to establish a rule which maintained a balance between the two competing interests regarding *ex parte* communications or, at the very least, could consistently be applied by practitioners.

## B. *RPC* 4.3

Similar to the history surrounding *RPC* 4.2, the Debevoise Committee advised the New Jersey Supreme Court to adopt the 1982 Model Rules version of Rule 4.3. *See* Report of the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, 112 N.J.L.J., July 28, 1983, supp. at 23–24. The Debevoise Committee reviewed Model Rule 4.3 which provided:

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that a lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

*See* Rules of Professional Conduct, 114 N.J.L.J., July 19, 1984, supp. at 11.

The only comments proffered by the Debevoise Committee in its report were that Model Rule 4.3 "has no direct counterpart" and that "under some circumstances it may be sufficient to suggest that the unrepresented person retain counsel." *See* Report of the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, 112 N.J.L.J., July 28, 1983, supp. at 23. The New Jersey Supreme Court adopted the recommendation of the Debevoise Committee on July 12, 1984 and adopted *RPC* 4.3, specifically noting that "it may be sufficient merely to suggest that the unrepresented person retain counsel." *See* Rules of Professional Conduct, 114 N.J.L.J., July 19, 1984, supp. at 11.

## C. *RPC* 1.13

In June 1983, the Debevoise Committee recommended the adoption of Model Rule 1.13, which applied to the conduct of an attorney representing an organization, stating only that although "[t]here is no counterpart to Rule 1.13 in the existing Disciplinary Rules ... [t]he increasing complexity of corporate representation highlights the necessity for such a rule." Accordingly, the Committee recommended its adoption. *See* Report of the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct, 112 N.J.L.J., July 28, 1983, supp. at 10. At that time, Model Rule 1.13 provided:

(a) A lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents.

(b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization or is a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer

shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization. Such measures may include among others:

(1) asking reconsideration of the matter;

(2) advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.

(c) When the organization's highest authority insists upon action, or refuses to take action, that is clearly a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, and the lawyer reasonably believes to be in the best interest of the organization. Such action may include revealing information otherwise protected by RPC 1.6 only if the lawyer reasonably believes that:

(1) the highest authority in the organization has acted to further personal or financial interests of members of that authority which are in conflict with the interests of the organization; and

(2) revealing the information is necessary in the best interest of the organization.

(d) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer believes that such expla-nation is necessary to avoid misunderstanding on their part.

(e) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of RPC 1.17. If the organization's consent to the dual representation is required by RPC 1.17, the consent shall be given by an appropriate official of the organization other than the individual who is represented or by the shareholders.

*See* Rules of Professional Conduct, 114 N.J.L.J., July 19, 1984, supp. at 6–7.

The New Jersey Supreme Court adopted the recommendation of the Debevoise Committee on July 12, 1984 and adopted *RPC* 1.13, noting only that the rule did not have a Disciplinary Rule counterpart. *See* Rules of Professional Conduct, 114 N.J.L.J., July 19, 1984, supp. at 7.

## IV. SPECIAL COMMITTEE ON *RPC* 4.2 (and, incidentally, 4.3 and 1.13)

Following the publication of *Opinion 668,* the New Jersey Supreme Court created the "Special Committee on *RPC* 4.2" to study the ethical issues surrounding *ex parte* interviews. *See Notices to the Bar,* 139 N.J.L.J. 1161, 1193 (March 20, 1995). In 1995, the Special Committee on *RPC* 4.2 (hereinafter "the Committee") published a report wherein the Committee determined that, after a thorough review of the case law and various literature relied upon by the legal community, it would enforce the absolute bar to *ex parte* communications with represented parties. *See id.* More important, the Committee believed it had developed a functional approach for adjudging who was a represented party, (and, therefore, within the purview of *RPC* 4.2) for those situations involving organizational parties. Among other things, the Committee considered in great detail, and ultimately rejected, various judicial tests and frameworks for resolving the confusion surrounding current and former employees of corporations and organizations, particularly the following: (1) "the blanket prohibition test"; (2) "the facts and circumstances test"; (3) "the control group test"; (4) "the alter-ego test"; (5) "the managing speaking agent

test"; and (6) the *Opinion 668* test. *See id.* The Committee then set forth its reasoning supporting the unanimous recommendations, which included essentially three amendments to the Rules.

First, the Committee recommended that *RPC* 1.13 be amended to include language providing that organizational representation be extended only to the "litigation control group." *See id.* The Committee stated that "[t]he amendment of paragraph (a) of this rule lies at the heart of the Committee's proposal for defining those persons who, *for the purpose of R.P.C. 4.2*, are deemed to be represented by the organization's attorney and hence who may not be communicated with by an attorney representing the interest of another in the subject matter." *Id.* (emphasis added). Accordingly, the Committee recommended that the litigation control group be defined to include current and former employees of an organization, corporate or non-corporate, who are or were responsible for or significantly involved in the determination of the organization's legal position. *See id.* Although not proposed to be expressly defined in the Rule, the Committee stated that "significant involvement would be defined to require involvement greater than merely providing factual information or data regarding the matter in question." *Id.* The Committee referred to this test as the "legal position" test.

Rejecting the distinction between current or former employees for purposes of *RPC* 1.13 (and 4.2), the Committee expanded upon this part of the analysis: "[t]he key is not the agent's or employee's status but role in determining the organization's legal position." *Id.*

Furthermore, the Committee reasoned that "[t]he fact that an agent or employee may impute liability, in and of itself, does not determine whether he or she is represented by the organization's counsel, thus implicating the ex parte communication bar." *Id.* Consequently, an organization would be precluded from attempting to cast its protective litigation control group web over the typical fact witness. The Committee stated: "[o]nly in those situations where the fact witness would also be significantly involved, in ways other than just supplying information, in determining the organization's legal position would the bar apply." *Id.* Thus, the fact that an employee was involved in the subject matter of the litigation in some limited way would not, according to the Committee, place that employee within the confines of the litigation control group.

As a result of the aforementioned proposed amendment to *RPC* 1.13, the Committee proposed a second amendment consisting of two parts. First, *RPC* 4.2 should be amended to include members of the organization's litigation control group among those persons protected by the *ex parte* communications bar. *See id.* Second, *RPC* 4.2 should be amended to include language providing that it is the approaching attorney's responsibility to exercise "reasonable diligence" in ascertaining whether a person is represented or, in the case of an employee of a corporation or organization, a member of the litigation control group. *See id.* The proposed amendment would indicate that reasonable diligence would include, but would not be limited to, an initial communication designed to ascertain such representation or entitlement to representation. *See id.*

Finally, the Committee also suggested a third amendment: *RPC* 4.3 should be amended to include language which would require an attorney to advise a person, once the attorney ascertains that the person is not represented by the organization's attorney (*i.e.*, within the purview of *RPC* 1.13(a) or *RPC* 1.13(e)) or entitled to such representation, that as far as he understands the interviewee is not represented by the organization's attorney. *See id.*

Ultimately, the special committee recommended various language to be used in the amendments to *RPCs* 4.2, 4.3 and 1.13. *See id.*

Upon publication of the initial report by the Special Committee on *RPC* 4.2, the Court received an abundance of comments. As a result of those comments, the Committee reconvened and filed a Supplemental Report on May 6, 1996. *See Notice to the Bar,* 145 N.J.L.J. 318 (July 15, 1996). Therein, the Committee noted that it was adhering to the

reasoning set forth in the initial report with the exception of minimal modifications to *RPCs* 4.2 and 1.13 as set forth in the supplemental report. *See id.*

The first modification to the original report involved "former" employees of a corporation and their recommended status as members of the litigation control group. *See id.* The Committee reaffirmed its initial position that former employees of a corporation presumptively should be deemed members of the litigation control group. The Committee added, however, that, because both current and former employees of a corporation do not lose their right to seek independent legal advice as a result of their current or former employment, *RPC* 4.2 should be amended to reflect that option.

The second modification to the initial report also involved former employees of a corporation. The Committee recognized that because the interests of a former employee may become adverse to the present interests of a corporation, an approaching attorney making communications pursuant to *RPC* 4.3 "may inquire as to whether the former employee disavows organizational representation or not." *Id.* Thus, the Committee recommended amending *RPC* 1.13 to reflect such "disavowing" language.

In conclusion, the Committee suggested that, if the recommended amendments to the *RPCs* caused any confusion for an attorney seeking to inquire about representation pursuant to *RPC* 4.2, the attorney could consult the scripts set forth in *In re Prudential Insurance Company of America Sales Practices Litigation*, 911 F.Supp. 148, 152 n. 5 (D.N.J.1995) and *In re Environmental Insurance Declaratory Judgment Actions*, 252 N.J.Super. 510, 523, 600 A.2d 165 (1991).

## V. ANALYSIS OF THE PRESENT *RPCs*

■ On June 28, 1996, the New Jersey Supreme Court adopted the amendment to *RPC* 4.3 as proposed by the Committee in the initial report and also adopted those amendments to *RPCs* 4.2 and 1.13 as proposed in both the initial and supplemental reports. *See id.* The amendments to *RPCs* 4.2, 4.3 and 1.13 became effective on September 1, 1996. *See id.*

Today, *RPC* 4.2, as amended, provides as follows:

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by another lawyer in the matter, including members of an organization's litigation control group as defined by RPC 1.13, unless the lawyer has the consent of the other lawyer, or is authorized by law to do so, or unless the sole purpose of the communication is to ascertain whether the person is in fact represented. Reasonable diligence shall include, but not be limited to, a specific inquiry of the person as to whether that person is represented by counsel. Nothing in this rule shall, however, preclude a lawyer from counseling or representing a member or former member of an organization's litigation control group who seeks independent legal advice.

NEW JERSEY RULES OF PROFESSIONAL CONDUCT Rule 4.2 (West 2000).

The purpose of the Rule remains the same: "[t]he Rule aims at preserving the integrity of the attorney-client relationship , and 'the posture of the parties within the adversarial system.' Principally, the Rule seeks to protect the lay person who may be prone to manipulation by opposing counsel." *Michaels v. Woodland*, 988 F.Supp. 468, 470 (D.N.J.1997) (citing *Goff v. Wheaton Industries*, 145 F.R.D. 351, 354 (D.N.J.1992)).

*RPC* 4.3 provides:

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. If the person is a director, officer, employee, member, shareholder or other constituent of an organization concerned with the subject of the lawyer's representation but not a person defined by RPC 1.13(a), the lawyer shall also ascertain by reasonable dili-

gence whether the person is actually represented by the organization's attorney pursuant to RPC 1.13(e) or who has a right to such representation on request, and, if the person is not so represented or entitled to representation, the lawyer shall make known to the person that insofar as the lawyer understands, the person is not being represented by the organization's attorney.

NEW JERSEY RULES OF PROFESSIONAL CONDUCT Rule 4.3 (West 2000).

Finally, the Court amended *RPC* 1.13. The pertinent language is as follows:

(a) A lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents. For the purposes of RPC 4.2 or 4.3, however, the organization's lawyer shall be deemed to represent not only the organizational entity but also the members of its litigation control group. Members of the litigation control group shall be deemed to include current agents and employees responsible for, or significantly involved in, the determination of the organization's legal position in the matter whether or not in the litigation, provided, however, that "significant involvement" requires involvement greater, and other than, the supplying of factual information or data respecting the matter. Former agents and employees who were members of the litigation control group shall presumptively be deemed to be represented in the matter by the organization's lawyer but may at any time disavow said representation.

NEW JERSEY RULES OF PROFESSIONAL CONDUCT Rule 1.13(a) (West 2000).

In the matter at bar, it is clear from the record that, prior to the date upon which Bergenfield contacted Guffey, any knowledge Bergenfield had about Guffey came from Whyler. Specifically during that short period of time, it appears that Bergenfield knew only a few things about Guffey, particularly that Guffey: (1) was employed as a Zone Manager at Goodyear; (2) was not a party to the pending case; and (3) may have had "evidence" of discrimination toward African Americans at Goodyear's North Brunswick facility.

Prior to engaging in any substantive *ex parte* communications about the "subject of the representation," Bergenfield was primarily obligated to determine if Guffey was in the "litigation control group" within the meaning of *RPC* 1.13(a) or otherwise represented by counsel. *See* NEW JERSEY RULES OF PROFESSIONAL CONDUCT Rule 4.2 (West 2000).

It is at this point in the analysis that this Court finds that the Magistrate Judge's decision with respect to whether, pursuant to *RPC* 4.2, Bergenfield was obligated to determine if Guffey was in the litigation control group or otherwise represented by counsel "before making contact" with Guffey is clearly erroneous and contrary to law. It is clear that the *RPCs* do not provide for such an interpretation. In fact, *RPC* 4.2 by it's very terms provides that, if an attorney does not "know" that a person is represented, either by individual counsel or by virtue of being a member of the litigation control group, an approaching attorney may communicate about the subject of the representation if "the sole purpose of the communication is to ascertain whether the person is in fact represented."

Further, an approaching attorney cannot simply state that he believed that the person was not represented or not a member of the litigation control group, and, therefore, begin engaging in substantive *ex parte* communications. Instead, *RPC* 4.2 charges an approaching attorney with the duty of exercising "reasonable diligence" in ascertaining such representation. The Rule expressly provides that reasonable diligence shall include a "specific inquiry" of the person as to whether or not that person is represented or in the litigation control group. The Special Committee on *RPC* 4.2 went so far as to note in its Report that "such a direct inquiry of the person involved will not in every case satisfy the requirement of 'reasonable diligence.'" The Committee emphasized that "[t]he attorney making the inquiry, will ... have to exercise a high degree of caution and circumspection in making the inquiry of a person who may be or presumptively is a

member of an organization's litigation control group." The Committee concluded that the proposed "reasonable diligence obligation" would serve as the single exception to the bar on *ex parte* communications and would allow communication by the approaching attorney for the sole purpose of ascertaining the fact of representation. *See Notices to the Bar,* 139 N.J.L.J. 1161, 1193 (March 20, 1995).

From a policy perspective, this Court agrees with both Bergenfield and the National Employment Lawyers Association/New Jersey's position that if the Magistrate Judge's decision were allowed to stand, the goals and objectives which the New Jersey Supreme Court attempted to achieve by amending the *RPCs* would be eviscerated. As a practical matter, that interpretation would require the approaching attorney to first alert his adversary of his plan to contact the potential witness, via notice to the court or notice directly to the adversary. This, however, was not the intent of the New Jersey Supreme Court in amending the *RPCs.* With respect to current or former employees of a corporation, it has been recognized that "[t]he import of the change is to place beyond communication reach of the attorney for a party adverse to the entity only those persons who constitute the entity's litigation control group. No notice in respect of any other employees of the entity is required." PRESSLER, CURRENT N.J. CT. R., COMMENT 4:10–2[3] (GANN 1999).

It is also significant to emphasize that Magistrate Judge Rosen's opinion in *Michaels v. Woodland,* 988 F.Supp. 468 (D.N.J. 1997) does not imply that an attorney must determine whether a person is in the litigation control group or otherwise represented by counsel *before* initiating contact. To the contrary, Judge Rosen's opinion recognizes that an attorney must first determine whether a person is in the litigation control group or otherwise represented by counsel prior to engaging in any *substantive ex parte* communications not before initiating contact with an individual.

It is also worth noting that the *Michaels* case is a unique case which appears to be limited to the facts before the court. The *Michaels* case before that Judge was the unusual case where the plaintiff petitioned the court for an Order permitting *ex parte* contacts with potential fact witnesses employed by the defendant organization.[16] Accordingly, it was the Magistrate Judge who was in the shoes of the approaching attorney and was the person who performed the in-depth analysis of the potential fact witnesses and determined that they were not in the litigation control group or otherwise represented by counsel. An interpretation of Judge Rosen's opinion which requires attorneys to determine if a person is in the litigation control group or otherwise represented by counsel before contacting that person is unjustified and, in fact, clearly erroneous.

Thus, Bergenfield could contact Guffey for the purpose of finding out whether he was in the litigation control group or otherwise represented by counsel.

The Court would also like to point out at this juncture that Goodyear's understanding of *RPC* 4.2 and how it relates to *RPC* 1.13(a) is misguided. At the beginning of this saga, Sneirson, on behalf of Goodyear, wrote Bergenfield: "You have now apparently ignored the Rules of Professional Conduct concerning ex parte communications with management level employees of Goodyear. This is to demand that you immediately cease communications with Goodyear management. . . ." *See* Bergenfield Affidavit, Exhibit C; *see also* Goodyear Appendix, Exhibit F. Sneirson also reiterated this argument that "management-level employees" are off-limits at the beginning of the oral argument in this case. *See* Transcript of Proceedings dated April 8, 1999. Apparently, Goodyear is under the misimpression that *all* management-level employees are presumptively off-limits. This is simply not true. A thorough review of the history of *RPC* 4.2 reveals that the New Jersey Supreme Court ultimately rejected

---

**16.** Although plaintiff's counsel in the *Michaels* case petitioned the court for an Order permitting *ex parte* contacts with potential fact witnesses employed by the defendant organization, the Magistrate Judge's decision does not indicate in any way that such a tactic should be considered routine. *See Michaels,* 988 F.Supp. at 470.

the interim test used in *Opinion 668, i.e.,* the "control group" and "employee liability" factors, the latter of which required "notice to, rather than consent from, the organization's attorney...." *See Opinion 668,* 134 N.J. at 303, 633 A.2d 959. Instead, the Committee created, and the Court adopted, the "legal position" test and significantly narrowed the scope of those persons who would fall into the "off-limits" group. The legal position test does not focus on management-level employees. By limiting the scope of the *ex parte* communications bar to those persons in the litigation control group, the Committee and, clearly, the Court recognized that the bar could not apply to *all* employees since the interests of different employees may, in fact, actually contravene those interests of the corporation/organization. In that case, it could not be said that those employees were "speaking for" the organization. Consequently, an organization is precluded from attempting to cast its protective litigation control group web over the typical fact witness. Attorneys, therefore, should be focusing only on the "legal position" test for purposes of *RPC* 4.2.

Once the approaching attorney has ascertained that a person is not in the litigation control group or otherwise represented by counsel, the attorney's ethical obligations are not over. In other words, the attorney is not free under the *RPCs* to then engage in a substantive conversation with the potential witness, especially one that is employed by an organization. The approaching attorney must consider the requirements of *RPC* 4.3, which further addresses an attorney's communications with an "unrepresented person" and "employees of an organization." Thus, assuming at this point that the attorney has established to his satisfaction that the person is neither represented by individual counsel nor in a litigation control group, the approaching attorney must, first and foremost, not appear "disinterested." *See* NEW JERSEY RULES OF PROFESSIONAL CONDUCT Rule 4.3 (West 2000). If the attorney "knows or rea-

sonably should know" that the unrepresented person misunderstands their role in the case, the attorney has an obligation pursuant to *RPC* 4.3 to correct the misunderstanding. *See id.* Furthermore, if the person to whom the attorney is speaking is an employee of an organization (but not a member of the litigation control group), the attorney must again exercise reasonable diligence in determining whether the person is actually represented by the organization's attorney pursuant to 1.13(e) or has a right to such representation. *See id.*[17] If the approaching attorney ascertains that the person is neither actually represented by the organization's attorney nor has a right to such representation, the attorney has an obligation to "make known to the person that insofar as the lawyer understands, the person is not being represented by the organization's attorney." *Id.*

Nowhere in *RPC* 4.3 is there an obligation to secure any of this information *before* initiating contact with a potential witness. The Special Committee on *RPC* 4.2 clearly anticipated direct communication between an approaching attorney and the potential fact witness under *RPC* 4.3. Thus, the Magistrate Judge's ruling with respect to whether, pursuant to *RPC* 4.3, Bergenfield was obligated to determine if Guffey was in the litigation control group or otherwise represented by counsel "before making contact" with Guffey is clearly erroneous.

Prior to addressing the substantive conversation between Bergenfield and Guffey in order to determine if Bergenfield violated the *RPCs,* this Court must first note that Bergenfield was not obligated to follow an *exact* script when speaking with Guffey. If that were the case, the Special Committee on *RPC* 4.2 would have suggested a general script to be universally applied by practitioners. Furthermore, it is simply impractical to suggest, as Goodyear does, that every attorney, seeking to determine if a current employee of an organization is represented, is required to read in robot-like fashion from

17. *RPC* 1.13(e) provides:
   (e) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of RPC

1.7. If the organization's consent to the dual representation is required by RPC 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is represented or by the shareholders.

the same script. In fact, this Court believes such a requirement would seriously hinder an investigation by an attorney into the merits of a case. In spite of that belief, this Court recognizes that there should be a general format to which an approaching attorney should adhere in confronting a current or former employee of an organization which would insure that an attorney is abiding by his ethical obligations.[18]

■ Based upon a review of the entire record of this case, this Court finds that Bergenfield did not violate the *RPCs* when he contacted Guffey.

The Court's review of the substantive conversation between Bergenfield and Guffey was initially complicated by the fact that a review of both Guffey's deposition testimony about the pertinent conversation and Bergenfield's recollection of the conversation as set forth in his Certification revealed, at first blush, a considerable factual discrepancy. It actually appears that Bergenfield, a practicing attorney for 20 years, put his professional responsibilities aside and, instead, verbally attacked Guffey on the telephone without any regard for determining whether he was represented. Nevertheless, after a careful comparison of the deposition transcript containing Guffey's testimony with Bergenfield's recollection of the conversation, this Court finds that Guffey's deposition testimony is incredible for several reasons.

First, Guffey's entire deposition testimony reeks with concern over being involved in a lawsuit concerning racial discrimination.[19] Yet, for someone who admittedly was concerned about being involved as a potential

witness in a lawsuit involving working conditions which occurred at the plant where he was a Zone Manager, Guffey testified that he was not really paying attention to Bergenfield during his conversation because "the ballgame was on." *See* Goodyear Appendix, Exhibit 1 at page 191.

Second, Guffey testified that it just so happened that when Bergenfield called him on September 7, 1998, he had a copy of the memo he had written at his fingertips. Coincidentally, the memo was printed out three days earlier and documents, in significant detail, what could be described as evidence of discrimination. However, in what this Court perceives as objectionable behavior on the part of Sneirson despite the narrow scope of the deposition, Sneirson instructed Guffey not to answer Bergenfield's questions about why he had a copy of the memo by the telephone on that day. Apparently, this Court should simply accept that a potential witness, who was concerned about a lawsuit involving working conditions that allegedly occurred under his supervision, happened to be cavalierly sitting by the phone, watching a ballgame and, perhaps, to keep busy during commercials, kept a memo about his thoughts on discrimination in the workplace on his coffee table. To the contrary, the fact that Guffey was sitting by the phone with a copy of that memo indicates to this Court that Guffey was awaiting Bergenfield's call.

Third, the cross-examination of Guffey revealed that Goodyear's in-house counsel contacted Guffey only *after* Bergenfield spoke with Guffey on the telephone for the first time on September 7, 1998.[20] Perhaps Guffey

---

18. *See generally* Donna duBeth Gardiner, Esq., *Former and Current Employees: The New Rules on Ex Parte Contacts*, NEW JERSEY LAWYER January/February 1997; *In re Prudential Insurance Company of America Sales Practices Litigation*, 911 F.Supp. 148, 152 n. 5 (D.N.J.1995); *In re Environmental Insurance Declaratory Judgment Actions*, 252 N.J.Super. 510, 523, 600 A.2d 165 (1991).

19. For example,
Q. Were you at any time concerned about how this [discussion with Bergenfield] might affect your job?
A. Yes.
Q. What was the reason for your concern about that?

A. My concerns were fueled by my wife's seeing white before she sees black, so she always thinks the worst is going to happen.
*See* Goodyear Appendix, Exhibit 1, pages 179–180.

20. For example,
Q. Prior to my calling you on the phone, did you have contact with any lawyers for Goodyear, whether Mr. Conlan and his staff, or Ms. Sneirson, or Ms. Farber and her staff, in connection with the case here in North Brunswick that the plaintiffs have filed against Goodyear?
A. No.
Q. ....You had no contact with any lawyers for Goodyear prior to the time that Mr. Conlan

spoke more freely with Bergenfield on the telephone on that fateful day since he hadn't met with anyone from Goodyear. This is not to suggest that Goodyear's lawyers did anything inappropriate or unethical, but it is quite possible that Guffey could have become intimidated after speaking with Goodyear's attorneys. Conceivably, Guffey could have started to think he might lose his job. Whatever the reason, it is highly coincidental that, after Goodyear's counsel spoke with Guffey and Guffey was then deposed, Guffey's recollection of the pertinent conversation differed so drastically from what Bergenfield said happened. Quite simply, Guffey's testimony does not have the ring of truth.

This Court would be hard-pressed to believe that Bergenfield, other than identifying that he was an attorney representing African American plaintiffs in a lawsuit against Goodyear, asked *no* questions about whether Guffey was represented by counsel. Even a cursory review of the *RPCs* would tip off a lawyer that he must ascertain whether a party is represented. That is the essential purpose of the Rule which is titled: "Communication with Person Represented by Counsel."

As aforementioned, prior to engaging in any *ex parte* communications about the "subject of the representation," Bergenfield was primarily obligated to determine if Guffey was in the "litigation control group" within the meaning of *RPC* 1.13(a) or otherwise represented by counsel. Although this Court finds that Bergenfield satisfied his ethical obligations in determining whether Guffey was in the litigation control group or otherwise represented by counsel, this Court also recognizes that Bergenfield could have done a more methodical job of questioning Guffey. His method is certainly not one that should be followed by others. Nonetheless, Bergenfield did exercise "reasonable diligence" and did, in fact, ascertain to the satisfaction of this Court that Guffey neither was represented by counsel nor in the litigation control group prior to engaging in a substantive conversation. It bears repeating that Bergenfield swore in his Certification dated January 15, 1999 that:

> I told Guffey who I represented. He told me that he was expecting my call and had notes that he wanted to get before we spoke. I told him that he did not have to speak to me and I asked him if he had a lawyer. I also asked him if he'd spoken to the Goodyear lawyers in New Jersey. I told him that one lawyer represented Goodyear and another represented Tom Martin and the supervisors. He told me that he did not have a lawyer and he'd had no contact with Goodyear's lawyers.

*See* Bergenfield Affidavit, Exhibit B.

It is also worth noting that Bergenfield spoke with Guffey on September 7, 1998–an entire three months after Bergenfield filed the lawsuit against Goodyear. Surely, common sense dictates that if Guffey was in the litigation control group, he would have been contacted by Goodyear's in-house counsel by that time and informed that he was in the litigation control group. Thus, the fact that Guffey told Bergenfield he had not had any contact with Goodyear's lawyers could reasonably indicate, along with other information, that he was not in the litigation control group and, therefore, not "represented." As it turned out, Goodyear later admitted that Guffey was not in the litigation control group. This Court finds that Bergenfield did, in fact, exercise reasonable diligence in ascertaining that Guffey was not represented within the meaning of *RPC* 4.2.

Regarding *RPC* 4.3, there is no indication in the record that Bergenfield appeared "disinterested" when speaking with Guffey. Also, there is no evidence that Guffey misunderstood Bergenfield's role in the pending case. In fact, Guffey acknowledged that Bergenfield told him exactly who he represented during the telephone call.[21]

---

called you on September 16th about the topic of the lawsuit here at North Brunswick?
A. That is correct.
Q. Did you ever request, at any time prior to my calling you, that Goodyear lawyers represent you in connection with anything going on, as far as any part of the lawsuit here in North Brunswick?
A. No.
*See* Goodyear Appendix, Exhibit 1 at pages 174–175.

Bergenfield also was obligated to exercise reasonable diligence to determine whether Guffey, pursuant to *RPC* 1.13(e), was "actually represented" or entitled to request such representation. The Court will note that Bergenfield's Certification does not address whether he specifically ascertained whether Guffey was represented or had a *right* to representation by Goodyear, upon request, pursuant to *RPC* 1.13(e). Also absent from Bergenfield's Certification is any statement by Bergenfield to Guffey that, insofar as Bergenfield was aware, Guffey was not represented by Goodyear. Again, the fact that Guffey testified that he had not met with or heard from any of Goodyear's lawyers until three months after the case was filed could reasonably indicate that Guffey was not "actually represented" or told that he could be represented (based upon, for example, an employee contract or handbook) by Goodyear in this matter. Based upon the record and the facts of this case this Court finds that Bergenfield substantially complied with the terms of *RPCs* 4.3. Again, this Court would not dispute that Bergenfield did a sloppy job of addressing his ethical obligations but he has, nonetheless complied with the spirit of the *RPCs*. For sloppiness alone, however, this Court will not disqualify Bergenfield.

Clearly, this is a matter which is extremely fact sensitive. There is no magic formula for determining these very important issues.

This Court would strongly recommend that attorneys proceed with caution and, being mindful at all times of the ethical responsibilities surrounding *ex parte* contacts, err on the side of caution.[22]

## CONCLUSION

Based upon the foregoing reasons, Magistrate Judge Hedges' Order, is **REVERSED**.

An appropriate Order accompanies this Letter Opinion.

---

21. For example, on cross-examination by Bergenfield, Guffey testified:

> Q. When you and I spoke, did I tell you that I was a lawyer for certain black employees who were suing Goodyear based upon their claims of racial discrimination of certain managers in North Brunswick?
> A. When we spoke, as best I recall, you said you were representing a group of black associates who had filed a suit against Goodyear from the North Brunswick facility, yes.
> Q. And I think you said earlier in response to one of Ms. Sneirson's questions that I also told you that they had been sued for libel and slander by Goodyear and its employees for some of the things that they had said about the lawsuit and their treatment.
> A. That is correct.
> Q. So I discussed both with you, is your best recollection?
> A. That's correct.

> Q. And it may be obvious, but did you understand that I was the lawyer for the black associates who were suing Goodyear, and not the lawyer for Goodyear, when I spoke to you?
> A. Yes.
> Q. And did you speak to me freely and voluntarily?
> A. Yes.

*See* Goodyear Appendix, pages 25–26.

22. Based upon the determinations made by this Court as to the first two issues, the remaining issues have been rendered moot: (1) whether, if this Court had determined that Bergenfield violated *RPCs* 4.2 and/or 4.3, he should be disqualified from this case; and (2) whether, if this Court had determined that Bergenfield violated *RPCs* 4.2 and/or 4.3, any information secured in violation of those Rules should be precluded from use in the pending case. These issues are reserved for another Court at another time.